Good morning, Your Honors, allow me to introduce myself. I'm Scott Hubbard. With me is Trial Counsel and 30-year ERISA veteran Jim Crawford. Would you speak up somewhat because these marble walls are not great. I'm fighting the same cold that everyone else is, so my apologies on that one. No problem. With the Court's permission, I'd like to reserve my time. Mr. Crawford, I have some things you'd like to say, unless the Court has any questions on the 99 transaction or the fraud and concealment arguments. Why did the employees agree to the 99 transaction? Probably because they were loyal and didn't know any better. It was in the culture that it was almost, it was almost, forgive me my brain's not functioning, ingrained into them that John Schneider created this company for you and he wants, you're his family, they didn't have any children. And so they were very loyal to him. And when they said that this is what he wanted, that's what they did. And are you seeking equitable relief with respect to the 1999 transaction? I'm sorry? Are you seeking equitable relief with respect to the There was lots of it. Unwinding the 1999 transaction, cancelling out the preferred shares, at a minimum a do-over, give, appoint independent trustees to go in and independent fiduciaries to go in and look at it anew without having a personal interest in the outcome, a on the other claims in terms of the hollow share sales. As I understand it, you have not appealed the district court's determination that there were no damages, correct? Mr. Crawford is going to touch on that, but yes, the court is correct. The court found that it was the fair, made a factual finding that it was a, was the fair market value. And so under the clearly addressed for factual findings, we really don't have anything to go with that. So in terms of what specific equitable relief you're seeking, are you going to address that or is Mr. Crawford going to? Mr. Crawford's going to address that. One thought, I'll save my rest of my time for rebuttal if that's all right. Thank you, Your Honor. Good morning, Your Honors. I may be the I would like to directly address the question the court just asked. While the district court did find that in the long run, there was no damage to the plan caused by leaving behind in the deal in millions in book value and giving that to JDS. We don't like that, but that's what the court found. So we have, we're stuck with that. But what the court did not address is whether in the short run, the plan was damaged. And more specifically, merely assume that if the plan was not damaged in the long run, then the participants were not damaged. And that's quite a different question. Well, it seems to me, I mean, this briefing is very confusing on this, and it seems to me that that's a, that's encompassed within what the district court did decide. And that you're left, based on what's in your briefs, on this issue with whether or not there should be equitable relief. Right. I will address that, Your Honor. Thank you. So what, can you just spell out for me so I can understand what equitable relief you're seeking and what you argue to the district court in terms of equitable? Okay, I will do that. Okay. All right. ERISA is there to protect the participants. The protection it affords to the plans is simply incidental to that. Now, in order to provide protection for the participants to ensure what they, that they get what they're promised, there are a whole host of rules that make these cases so darn complicated. The court's been addressing that for years. But one of those rules is that there are certain transactions which are absolutely prohibited, and that is transactions between a plan and a party in interest, which includes, in this case, JDS, either as a party in interest or as a fiduciary, and I'll get to that in a minute, and certainly includes the defendants as fiduciaries. So any transaction in, in which they are involved between a plan and a party in interest, unless they can show it is exempt, it is strictly prohibited. And then there has to be a correction. Now, there's two kinds of corrections that ERISA requires. One is that if the participants, as a result of the engaging in the participant transaction, are worse off, then that's got to be fixed. And usually the correction is to reverse the transaction, which is what Mr. Hubbard alluded to. And if you can't reverse the transaction, then you at least have to somehow make the, put the plan and the participants in the same position they would have been had the prohibited transaction not occurred. But here the district court has held that the position is the same, right? The dam, there are no damages. No. So I don't understand what equitable relief can get around that. Okay. The court didn't hold the position is the same. The court held that in the long run the plan was not damaged, that the, you could take out and leave on the table millions in, in book value and that did not damage the plan in the long run. Okay. The court also held that these were prohibited transactions. So the question is, in the, in the contours of that holding, what does that leave us with? But so are you saying that there are particular plan participants that because of when they left the plan or when they retired, they happened to be at a low point and so even though on average it, the plan wasn't harmed, there were particular people? And if that is what you're saying, where in the district court did you make that type of particular individual-by-individual claim and calculate the damages? Well, what we were not able to calculate the damages per participant because we asked instead that the equitable relief be put someone in charge who's not the fox, get the foxes out of the hen house and have this straightened out because what goes into determining what each participant would receive is incredibly complicated. But it's still a burden as the plaintiff, right, to show that there is injury and unless you as a, you can't just ask the district court prove our damages for us. Yeah. I'm, I'm going to get to that if you give me a moment here. Going back to the basics, when you have a prohibited transaction, there's two ways the participants are protected. One is, as I mentioned, you reverse the transaction, okay, that's equitable relief. And if you can't do it, then you've got to make the, make the participants whole. So obviously one of the equitable, one element of equitable relief is reversing the transaction. Yeah, but see, here's the problem we're having. You keep saying all those words, but you had a whole series of pretrial determinations by the judge. Then you have this trial. And in effect, you're now saying, despite the zero damages finding and the district court was quite clear that you didn't come in and show the damages, you're now saying, well, give us an equitable receiver or someone like that to go back and see if there aren't some other damages. That's basically what you're saying? Well, the law is that if what the defendants did put the plaintiffs in a position they really can't figure out what the damages are, that, that those doubts get the results. Well, you can figure out what the damages are, you just didn't put them on the table to the district court. No, we don't know what the damages are. Why? Because each, the damage would depend on each year. If you look at the brief, particularly the briefs filed by the defendants, you see how complicated. They say each year affects each year. And you have to have a ruling on each year before you can even do the next year. Well, but see, that's exactly what you do when you go to a damages trial. You get an expert, the expert goes in, they look at all the transactions, they put categories of plaintiffs in boxes, and then they come up with the damages for better or for worse. But the district court didn't have that in front of him that he could make a determination that there was a shortfall. So now, is there any other equitable relief that you would are asking for that these plaintiffs can bring that doesn't relate to either a trustee or recoupment of individual claims? Well, we did prove at trial that each below book value transaction caused the plan to leave money on the table, which went to JDS, a party in interest. We did prove that. So immediately we proved that there were damages. I don't think you did, though. The district court found that you didn't. No. The court did not find that, Your Honor. With all due respect, the court found that in the long run, those immediate losses did not cause permanent harm to the plan, but there were immediate losses. Well, is there anything else? So answer my question, which is, however one might interpret the district court's finding, and we'll look at it, I'm sure the defendants will, and we understand yours, is there anything that you asked for in the district court in terms of equitable relief that does not circle back, in effect, to monetary relief? Absolutely, Your Honor. The other part of that I was trying to get to is that the rule against prohibited transactions is that whether or not the plan is damaged by a prohibited transaction, we do not want to encourage fiduciaries to get involved in these transactions. They are prohibited. Now, one very clear rule, amalgamated clothing in the Supreme Court and everything else, says that if a party in interest has, whether it's a fiduciary or not, if a party in interest has profited as a result of the transaction, then that profit has to go back to the plan, because you can't allow them to keep the profit. Okay. But that's money. Okay? I'm asking you, is there anything that is not reduced to money that you asked the district court for in terms of equitable relief? Because that's — I'm hearing dollars when you're talking. Well, the equitable relief is that it would be a surcharge once you determine what the profits that go back to the plan are. It would be a constructive trust on the profits. We asked specifically — we asked the district court specifically to determine — to issue an order that required the return of any profits received by the defendants to the plan. We specifically asked for that. Now, were there profits? That was proven without question there were profits, because when you sell — when the plan sells stock for below book value, the value that's left on the table goes to JDS, the employer, and then is shared among all shares of stock. Okay? They all increase in book value. Now, there's no question that defendants individually, as direct shareholders, owned stock in JDS. So every time they sold the plan's shares for below book value, the book value of their stock increased. But if the district court found that over time there wasn't a loss to the plan, then isn't the flip side of that, that over time there wasn't a benefit to these jurors? No. There was no finding to that effect. And in fact, you can have — If one side didn't lose — if you're saying one side gains when the other side loses and the court found that this side didn't lose, then how did this side win? Because it's a function of the defendant's book value system that when you — let's just take a — let's take an example. Did you make that argument in the district court? I'm sorry? Did you make this argument in the district court in the trial? Yes, we asked for profits, Your Honor. And we proved that they — that they received these profits. And that was part of the testimony, that every share after a transaction for below book — And have you appealed any of the court's determinations on the monetary issues? Yes, we appealed — we appealed the entire decision to the extent that the prohibited transactions — Not that — not that it — not that — according to your brief. Well, no, the brief does say we asked for profits, Your Honor. It's in the footnote. But you say that you're not appealing the damages ruling, and I just can't separate them. I can't figure out how you're separating them. Okay. All right. I'll give you an example. Suppose that the plan left — lost a million dollars on a sale. Okay? Now, immediately following that, the plan is a million dollars short. Okay? That means the count values of all the participants are a million dollars short at that point in time. Okay? Now, a participant who leaves with that million dollar — owning a part of that shortage leaves without his full benefit or her full benefit. Okay? That is a damage. Now, until every one of those sales self-corrected — and we don't know how long it takes, but it took years according to the briefs — until all of those are corrected, anyone who leaves before then doesn't get their full account balance as promised to them. And that's what a risk is all about. But is there any — I mean, this gets back to my question from before. You're trying to say now if we look individual by individual, but I didn't see anywhere in the district court where you offered a damages analysis individual by individual. So I don't see how you've preserved this. No. We couldn't offer a damage analysis, Your Honor, because we couldn't even get enough information to tell whether fair market value — okay. The burden on the — was on the defendants to prove fair market value in order to — as one of the elements of getting prohibited transaction exemption. They failed to do that. Okay. We don't know or weren't able to show, based on the information we had, whether — what fair market value was. And without that, we can't prove what damages are. Right. But this late in the game, you've had all the discovery that you wanted because you still are the plaintiff to bear a burden should you want some equitable relief. What footnote page are you referring to? With respect to the individual profits. We'll have to look it up, Your Honor. I'll give you that. Okay. If you can have Mr. Hubbard tell me. Yeah. If you do a search of the profits. Now, you've pretty much used up all his time as well. So you only have five minutes left, and you can use it however you wish, but he may want some additional time based on what he indicated at the outset. All right, Your Honor. Thank you. Thank you. All right. We'll hear from Alistair. Thank you, Your Honor. May it please the Court, my name is James Adduci, and I am representing the appellees and cross-appellants. I'd like to move off of my script here and answer a couple of questions that came up when counsel was talking. First of all, with regard to damages or profits that the fiduciaries reaped, the question was, was there any evidence that plaintiffs put on that the fiduciaries, in fact, reaped any profits or had any benefits? In the trial court opinion in footnote 30, which I think is maybe the footnote they were thinking of, I'll read it to you. In their five proposed orders, plaintiffs do not request damages based on any profits the fiduciaries allegedly received as a result of their breaches. So they did not seek them, they did not prove them. Now, I'm a little confused, as apparently you are, as to where they are on damages in general. In their third brief on cross-appeal, they said, on page 31, the defense seems to be operating under the assumption that plaintiffs dispute the district judge's finding of no actual harm or damages. We aren't. So I think again, to come back to some of the questions that Your Honor has asked, I think we're in a situation where all they are seeking is injunctive relief, which they have not been able to articulate to you, as they were not able to articulate to Judge Shubb exactly what relief that is. The fact, you know, 11 years into the case was the first time, I think, that we heard in that third brief that they were not seeking any monetary damages. That should be the end of the case, we submit, because there cannot be any monetary – where there cannot be any monetary relief, there's no injury. And this Court held that, we submit, in Wright v. Oregon Metallurgical Corporation, in which you said, and this isn't a quote, to show a breach of fiduciary duty, a plaintiff must show a causal connection between a failure to investigate and harm suffered by the plan. That's at 360 F. 3rd of 1099. You said the same thing in Skinner v. Northrop Grumman more recently. So then we, again, I think we go back, if there's anything left at that point at all, I think we go back, as we must, to injunctive relief. And what injunctive relief can there be? Judge Shubb found that there cannot be perspective of equitable relief here, because the plaintiffs have long ago ended their participation in the plan, and therefore, they lack constitutional standing to seek such relief. So we think that the Court should affirm on that basis. Now, I want to talk a little – Let me ask you about that. Yes, Your Honor. It may be that they haven't articulated, but it would seem to me that, based on the standing to allege both damages and potential equitable relief. So it's not – it's like splitting the causes of action, in effect, to say it's a standing question. Why wouldn't they have standing on the day they filed this lawsuit, which is when we look, to make both of those claims? Well, they might have had standing, certainly, for the monetary relief at the beginning of the lawsuit. We're not saying they don't have standing to claim monetary relief. We're saying they're not claiming it, and they didn't prove it. We're saying they don't have constitutional standing to ask for injunctive relief. And that, Your Honor, it doesn't matter whether they had such standing at the beginning of the case. We don't think they did. But the Hollingsworth case, a recent Supreme Court case that I know you're familiar with, makes it absolutely clear that you have to have constitutional standing at each stage of the litigation. Because if you don't, it just makes sense. It's constitutional standing. The Court loses jurisdiction over the case if there is not constitutional standing at each stage of the case. Absolutely clear from that. Would they – would they have constitutional standing, in your view, for equitable relief against the plan generally? No. No, Your Honor. They absolutely would not. Would Mr. DeFazio, because of this sort of hanging little thing that he has? No. And why not – would you address Mr. DeFazio as a potential foundation for standing vis-à-vis equitable relief? Yeah. He – he might have standing, conceivably, for a monetary claim, because that's what he's seeking, with this little part that hangs on. We don't think so. His ex-wife had an account balance, as you know. She was the former employee of Alistair. They were getting divorced. He received part of her plan as an alternative payee. I understand. So, I mean, I guess the question is, is it your view that his claim is restricted to his Quadro-related transaction money? Yeah, absolutely. Absolutely. I think that's all he's claiming. The point is that none of the plaintiffs here was a participant of the plan at the time that they filed suit. So, as you know, Article III standing requires the plaintiff has suffered a concrete and particularized injury, fairly traceable to the challenge conduct, which is likely to be redressed by a favorable judicial decision. There's nothing to be redressed, as to any of the plaintiffs here, by a favorable judicial decision, because none of them have had anything to do with the plan for years. The case has been going on for 11 years. None of them were participants in the plan before the case was filed. So there is no constitutional standing for any of them, for any relief. But it could have been, getting back to Judge McKeon's question about this, before we knew that they couldn't prove damages, they had standing for both. At the time suit was filed, you couldn't have dismissed for lack of standing just because they were no longer participants, because some of these equitable remedies could essentially be a way to get money. It's not until later, when you find out you won on the question of money, that now there's a question of, well, what kind of equitable relief. But is that really a standing problem, or just a merit? Like, there's no equitable relief that they can really ask for, as people who are no longer in the plan, that makes any sense anymore once there's no way to get money. I think it's a standing problem, because it does certainly go to the redressability aspect of constitutional standing. Judge, you started out by asking about the 99 transaction, which is kind of a small part of the whole big picture, but Judge Shub used the same analysis in ruling in our favor on summary judgment as to the 1999 transaction. He said that the plaintiffs claimed that if that transaction had not occurred, the plan would have achieved a controlling position in JDS, which allegedly would have increased the value of JDS stock held by the plan. The court said, the trial court said, that it had been proven that this did not, could not, and would not have occurred during the time that any of the plaintiffs were still participants in the plan. He also said it depended in part on actions of third parties, which is a separate question, but he said that even if the plaintiffs were theoretically harmed by the 99 transactions, they would not likely, that harm would not likely be redressed by a favorable judicial decision, and that's exactly what we're arguing as to any and all injunctive relief, and that he did, too, by the way. I think in some ways he kind of conflated traceability with redressability, although it's a legal question, I recognize. I'm not sure if I agree with that or not, Your Honor. I'm not arguing with you about it. But I think in any event, it's very clear, if you want to focus on any one of those elements, the redressability element absolutely can't be met as to any injunctive relief being sought here. I just want to make sure I'm following. Yes, Your Honor. Or let me ask this question. If we determine that plaintiffs have not shown damages from the JDS share sales and lack standing based for economic, prospective economic relief, and then also lack standing to make claims based on the 1999 transaction, do we need to address any other issues concerning the alleged fiduciary breaches? We would like you to, Your Honor, because those the fiduciary breaches do affect the people that were found to have breached their fiduciary duty. I mean, that's a good and legitimate question, obviously. But these people, if they want to be on another board, if they want to be a fiduciary somewhere else, they will have this hanging over their heads that they breached their fiduciary duty here. So we would hope that you would, of course, affirm on the underlying judgment, but we would still like to be able to have the findings of breach of fiduciary duty vacated. Does that answer your question? Yes. Could I ask you a question about passive concealment? Yes. So I understand our Court's case law to say that passive concealment is insufficient to constitute fraudulent concealment that will give tolling unless the defendant had a fiduciary duty to disclose information to the plaintiff. And I thought ERISA gave fiduciaries an obligation to disclose material information. So I'm not sure how you can get around this passive concealment problem. Your Honor, my understanding is a little different than yours with regarding to law on passive concealment as opposed to fraud, to underlying fraud. I believe the case law is pretty clear that with regard to passive concealment, you do need to have some affirmative act of concealment. For example, in the In Re In Grope, I'm not sure how you say that, NV ERISA litigation, the Court said that there's got to be a notice of possible misadventure. And let me see if I can find another one here. Sorry. Well, we submit actually that this Court's case in Barker v. American Mobile Power Company says that the passive concealment alone is insufficient to toll the statute of limitations, and the other. But we do have that language, but then of course we have a sort of perhaps stray language, which I confess to have written apparently, in a, in a, in a statute non-ERISA case. And so can those be reconciled? Well, there are, if I can just defer that question for a minute, there are other elements here that I think make us perhaps not even have to answer that question. There's got to be evidence that the statements were intended to mislead. And in addition, we've argued here that the statements that are at issue here, these disclosures, are not really material statements. There's a sort of a convoluted exercise that you have to go through that you saw on the back. But that's, that sounds like a factual, like, if we think the district court was wrong about whether passive concealment could be sufficient, do we need to remand on that to make these kind of factual determinations about whether the statements were material or whether they were intended? Those sound like pretty fact-based issues. I don't think you, I don't think you do, because I do think that they're, they're Well, I guess if you disagree with me that passive concealment is enough, although I think that is contrary to a lot of case law from a lot of different circuits, if you agree that passive concealment is enough, then I think we have to go to one of these other reasons why, and I think it's clear on the record, I don't think you have to remand. One of the other reasons. But just so we're clear on what boxes of claims we would be talking about, the district court found against you, so to speak, on statute of limitations with respect to the 93 forward transactions, correct? Yes. And that went forward on the trial. Right. So if that gets upheld, in a way those issues fall out. Exactly. Okay. Exactly. But then we do have the pre-93, that is, up to 92 transactions that are hanging in the balance, and your argument is Barker plus intent, which are independent arguments? Yes, I am. I think that, and again, I think the case law, and I'm sorry I can't quote another case to you right now, but I think the case law is pretty clear that you do need some sort of active concealment. But in any event, I think Barker plus the intent issue would not require you to take any further action on that. And of course, I hope that you Well, is intent, I'm not sure I read that into the cases. Is that just a variation on passive concealment? I don't think so, Your Honor. I think that there's a requirement of something more than, again, even if you accept that passive concealment alone is enough, I think there's got to be some intent that they deliberately passively concealed the If you talk about deliberately passively concealing, how is passive concealment different than fraudulent concealment? I thought passive concealment was really a different thing, but once you start calling it deliberate, they start to merge, maybe? Yeah, I think, again, that there's, I think there's a distinction that I have found difficult, frankly, to make between fraud as a cause of action and as something that tolls the statute of limitations. I think fraud as a cause of action is broader. There is certainly silence where there's an obligation to speak comes in there. From my reading of the case law, that does not come in, in the realm of tolling the statute of limitations. On the pre-'92, the district court did find that you didn't, these Holly Notes Holly Share Highlights Highlights? Yeah, the Holly Share Highlights did not contain statements of the nature that were contained in 93 forward. Right. So was there any evidence other than the potential existence of a claim, was there any evidence offered by the plaintiffs to show any kind of concealment pre-'93? No, not at all. I can read you from the Court's opinion again, Your Honor, if you like. Judge Shub said, And most of the Holly Share Highlights from 82 to 92 omit arguably material information which is insufficient to trigger the fraud or concealment exception. But so if he's wrong, if passive concealment where if there's a duty to disclose and there was material information that wasn't disclosed and that's enough for tolling under the passive concealment when you have a fiduciary duty, then that sounds like a legal error, right? I mean, I know you don't think that's the law, but if that's the law, then he didn't really analyze the facts because he just thought legally this can't survive. Yes, you're right. I think that, but I do think he was right on the law. And again, there's these other factors why I think that even if even if he was wrong on the law, these statements from 82 to 93 don't change anything. But he never made a factual finding about those statements because he thought passive concealment wasn't enough anyway. That's correct. A general case, a general point I wanted to make here, and I see I'm running out of time, is that I think you've got to step back and look at this plan in general as compared to other plans that have been found that have had errors, prohibited transactions, whatever with them. Despite all the plaintiff's rhetoric here about fraud and breach of fiduciary duty, the undisputed evidence showed that for 40 years here, the defendants have operated a retirement program that's provided its participants with the consistent appreciation in their accounts at the rate of approximately 25 percent per annum. The plan's fully funded and all benefits have been paid on time as promised. Contributions to the plan are made purely by Hollister. Employees do not and cannot contribute their own money. Instead, the governing plan instrument requires Hollister to make a substantial minimal contribution to each participant's plan account each year. And in fact, the evidence showed Hollister made much more than the minimum contribution to the plan each year. From 1990 to 2010, the evidence showed Hollister contributed over $100 million to the plan, of which about a third of that was amounts they were not required to contribute. On top of that, on top of the company's contributions, the participants benefited from the incredible year-to-year appreciation of the book value of Hollister's JDS common shares, which is mandated by the Hollister plan comprised almost the entire Hollister trust fund. That's the principal driver of increases in the value of Hollister participant accounts. The annual appreciation in the book value of these shares is far outstripped comparable indexes of publicly traded stocks. Not once in the history of the plan has the book value of the shares declined, so no Hollister participant has ever seen his or her Hollister account decline. The plan has allowed long-term employees, not high-level employees, but mid-level employees, to retire as millionaires, but all this is not good enough for the plaintiffs. Well, I mean, that's true. Maybe they would be more than millionaires plus, I suppose is their argument. But so that doesn't make it, you know, right or wrong just because people ended up with a fair amount of money. Let me ask you, one of the arguments the plaintiffs made is that Mr. Fergerman and Gronenberg were actually fiduciaries. In fact, they're listed in the documents as that. It wasn't an argument that I saw responded to you in your brief. I don't think that was raised on appeal, Your Honor. Okay. I thought it was, but I'll go back and look. I thought it was, too. Well, ask me your question. But why don't we address it now and then we'll figure out if it was waived or not waived. Yes. I believe what the judge found is that they were in at a very early stage and that there was no evidence as to their involvement in anything that was involved in the case. If there's no other questions, I think I'll sit down. All right. Thank you. Thank you. Mr. Hubbard, do you have some time? And if you happen to have the citation that we talked with Mr. Crawford about the footnote in your brief about profits, that would be helpful. I did. And what that footnote was, if you look to the footnote he was thinking of was footnote 12, page 44 of the first brief, in which we acknowledge that Judge Carlton said, or excuse me, Judge Shub said on ER 65 that we had failed to include any evidence or had not asked it when, in fact, we had. And we cited to our order, I believe it was ER 223 to ER 33, where we included profits. Second, I'm going to go in reverse order. I hope the court doesn't mind, and I'm going to go quick. No evidence that Judge Shub said that there was no evidence at trial that those two individuals were fiduciaries. We did address this in our first brief. We cited to the evidence they were. Second, Thorman. I don't think Thorman was off the rail with respect to passive concealment. Passive concealment is an age-old principle that roots back into equity. It's kissing cousin to the fraudulent concealment. So passive concealment and fraudulent concealment are, well, there's, well, I know you're on the, you guys understand that one. Participants, counsel said participants, they weren't participants anymore. That's against Supreme Court authority. The Supreme Court, I believe, said in LaRue that a participant is still a participant and still has standing accordingly. Next, to the issue that. You know, there's kind of two types of standing, of course, that seem to have been talked about alternately here. One, of course, is standing under ERISA in terms of suing, bringing suit, and then the other would be. Prudential and constitutional. Yes, Your Honor. So I think that in the ruling, I believe Judge Shub probably was referring to constitutional standing. He was. But they were, regardless, they were, participants are still participants under both in the Supreme Court, and I believe this Court has said that twice. I understand what you were trying to discuss with Jim Crawford regarding the, once you take money out of it, once you take the, well, let's just say money out of it, what's left in the equitable relief. I also understand his argument regarding individual profits. If you look to ER pages 247 to 262, you'll find our tables and our arguments where we broke down how much each individual was entitled to. I looked at those, though, and I saw no methodology. So they're arguing that another reason to affirm here is that you never gave a methodology that gave any explanation for those numbers. You say you did give a methodology and you just point to those numbers. There's no explanation of a methodology. So is there somewhere else where there's a methodology explained? I believe in the TCAP we reference this, or third brief we reference this, but the methodology Right. In the third brief, so page 36 of your third brief, you reference the ER 248 to 262 and then SCR 107 to 108, which are just two pages of deposition testimony, which don't explain a methodology. Fair enough. If memory serves on the methodology, and forgive me on this one because my brain is half-baked, we took what the plaintiffs were entitled to and what they should have received if they stayed invested in the plan, but with the court's leave, I'd like to submit something, a 26-J letter on that one in the next day or so, so we can explain our methodology. Why should we let you do that, though, when they raised this issue and you in your brief cited what you said was your methodology and cited nothing? I mean, they cited something, but it doesn't have a methodology. Fair enough. Well, it's a 28-J letter, and if you have something, a different page reference, no argument. Of course, Your Honor. Then I'll permit you to file a 28-J letter with copy to the other side. Fair enough. That would just simply point us to a point in the record. That is wonderful. I'd be happy to. Thank you. One last point I want to make, back to the biggie, the equitable relief, the non-monetary equitable relief. Surcharge is not the alpha and the omega of what you can get under ERISA. It's one little sliver of it. And what Judge Shub described in his trial court order were fiduciaries who weren't conducting independent investigations, weren't negotiating the sale of plan stock, weren't doing their jobs to protect the interests of the plan. They were letting JDS set the price and doing nothing about it. We brought all these to his attention. We said at the very least in our proposed order and in our proposed findings of fact and conclusions of law, they need to conduct an adequate investigation. You just can't let we have all these we have 60 pages of ERISA violations of not doing your job. Just because even if we don't get a dime, even if the clients don't get a dime, there are still hundreds, thousands of people, I think it's thousands, in the plan suffering under this type of a situation where trustees and fiduciaries aren't doing the jobs and just letting JDS call the shots. Well, they could certainly bring a claim if that's true, no? They could certainly bring a claim if that's true in terms of forward relief. That's true. And that's the 800-pound grill in this room is anyone with a copy of this order can hand it to an ERISA fiduciary, the plan, and they can bring a lawsuit also. But they shouldn't have to because we asked that it be fixed. We included our proposed order, which, if you look, wasn't limited to and our proposed arguments or our findings and arguments weren't limited to just give us money. They need to start using appraised book value on these plan assets because book, excuse me, appraised fair market value on these assets because book value is too darn easy to manipulate. Why don't you have a plaintiff who's still in the plan? Okay, Jim Crawford had an excellent point. They are technically still in the plan under ERISA. Why don't we have a current employee of the plan? I don't have. But as to these individuals, such a change, although they might have a statutory right under ERISA, they don't have any, you know, anything in the game in terms of going forward, correct? In constitutional standing? Right. Yes. They have a colorful claim. Colorful. Colorable maybe. Colorable. Thank you, Jim. A colorful claim to benefits using Judge Breyer's analysis from LaRue and Firestone. Okay. Thank you. We've let you exceed your time already and we appreciate your arguments. There is a lot of briefing here, a lot of transcript, a lot of documents, so we appreciate contributions from all counsel. The case just argued of Defazio v. Hollister is submitted. All rise. This court, for this session, stands adjourned. Thank you.
judges: McKeown, Murguia, Friedland